Johnson, J.
This cause was tried upon issues raised by plea in abatement filed by defendant, Metzger. The plea is founded upon several claims. The most impressive of these relates to the qualification of one' Julius Frey to act as grand juror in this county. His eligibility depends upon his citizenship. Frey was born a subject of the Emperor of Germany. If he had not been admitted citizenship, he was not qualified to act as grand juror. *98 Whether his naturalization has been accomplished is determined by proceedings had in.the Probate Court of Lucas County, Ohio. The defendant asserts that the proceedings were so defective that, even if endowed with general power, the probate court did not acquire jurisdiction to act upon the application of Frey. He contends, further, that no niatter how perfect those proceedings were, the court was not invested by the act of Congress with authority to admit any alien to citizenship. If Frey was not a citizen the indictment returned bjr the grand jury of which he was a member should be quashed.
In addition, defendant insists that the panel was improperly made up from persons not qualified by selection from among those chosen by the jury commission, and also that the indictment was returned after a person, a stenographer, not authorized by law to be present, had entered the grand jury room and remained while evidence was received relating to matters out. of which the prosecution arose.
It is conceded that the authority through which the state courts admitted aliens to citizenship at the time Frey .presented his application to the probate court, existed under Section 2165 of the compiled statutes of the United States. This section is as follows:
“He [the alien] shall declare on oath before a circuit or district court of the United States, or a district or supreme court of the territories, or a court of record of any of the states having common law jurisdiction and a seal and clerk, two years at least prior to his admission; that it is bom fide his intention to become a citizen of the United States, ’ ’ etc.
Under the statute the defendant claims two questions are presented in the case at bar: First, have the probate courts of Ohio common law jurisdiction? And second, have they a clerk, within the meaning of this statute ?
Considering first the jurisdiction of the probate courts of Ohio in a general way, we find that court to be one wherein the presumptions are in favor of jurisdiction.
“The probate courts of this state are in the fullest sense courts of record; they belong to a class whose records import absolute verity; that are competent to decide on their own jurisdiction *99 and to exercise it to final judgment, without setting forth the facts and evidence upon which it is rendered. * * * The record showing nothing to the contrary, it will be conclusively presumed in all collateral proceedings that such order was made upon full proof of all the facts necessary to authorize it.” Shroyer v. Richmond, 16 O. S., 455. See, also, Hoffman’s Admx. v. Flemming, 66 O. S., 143, p. 146; Bank v. Telegraph Co., 79 O. S., p. 89-100; Fisher v. Quillen, 76 O. S., 189-196, et seq.
In the case at bar the judgment of the probate court was entered in a proceeding in rem and determined'that Prey, an alien, was entitled to become a citizen of the United States. The probate court adjudged his status so that he thereby became a citizen.
With these premises let us consider the claim that in the proceedings of the probate court a fatal defect exists, so that though the court otherwise had jurisdiction, yet in the particular case jurisdiction was not invoked.
The statute provides, among other things, that an alien at the time of his arrival in this country under twenty-one years of age, who has resided in the country three years next before becoming twenty-one, “and who has continued to reside therein to the time he may make application,” after five years residence may be admitted to citizenship. The proof contained in the exemplification of the record of the proceedings in the probate court in support of Frey’s application does not disclose that he continued thus to reside. Since the record produced does not affirmatively show this fact, and since the probate record does contain an affidavit supporting the application, it is argued that a defect fatal to jurisdiction is disclosed upon the face of the recprd.
Jurisdiction is the power to hear and determine a cause.
“Before this power can be affirmed to exist it must be made to appear that the law has given a tribunal capacity to entertain the complaint against the person or thing sought to be charged or affected; that such complaint has actually been preferred; and that such person or thing has been properly brought before the tribunal to answer the charge therein contained. When these appear, jurisdiction has attached; the right vto hear and determine appear perfect; and the decision of every question thereafter arising is but an exercise of the jurisdiction thus *100 conferred, and whether determined rightfully or wrongfully, correctly or erroneously, is alike immaterial to the validity, force and effect of the final judgment when brought collaterally in question.
“If the court had jurisdiction of the subject-matter and of the parties, it is immaterial how grossly irregular or manifestly erroneous its proceedings may have been, its final order can not be regarded as a nullify, and can not, therefore, be collaterally impeached. On the one hand, if it proceeded without jurisdiction it is equally unimportant how technically correct and precisely certain in point of form its records may appear; its judgment is void to every intent and for every purpose and must be so declared by every court in which it is presented. In the one case the court is vested with the -power to determine the rights of the-parties, and no irregularitiy or error in the execution of the power can prevent its judgment while it stands unreversed, from disposing of such rights as fall within the legitimate scope of its adjudication; while in the other its authority is wholly usurped, and its judgments and orders the exercise of arbitrary power under the forms but without the sanction of law.” Sheldon’s Lessee v. Newton, 3 O. S., 494, pp. 495-500.
“To bring a cause before a court competent to adjudicate it, it is not only necessary that the parties should be in jus vocatio, cited or summoned in the manner required by the law of procedure, but a ease must also be made or stated affecting the party against whom the relief is asked. * ® * It is not necessary that the statement of the claim should be so perfect in form and substance as to be free from objection on demurrer to confer jurisdiction upon the court to hear and determine. If the case presented invoked the jurisdiction of the court and could have been perfected by amendment, the judgment of the court thereon could not be treated as a nullity. ’ ’ Sporr v. Coens, 44 O. S., 497, p. 503.
If thus jurisdiction appear, the judgment of the court exercising jurisdiction is not open to collateral attack. And in the case of Sheldon v. Newton, cited above, Ranney, J., further says:
“The proposition that the jurisdiction can be made to depend upon the records disclosing such a state of facts to have been shown in evidence as to warrant the exercise of its authority, was distinctly repudiated in the early case of Ludlow Heirs v. Johnston, 3 O., 560, and has been no less positively denied in *101 every subsequent case including Adams v. Jeffries, 12 O. S., 253. This court wholly dissents from it both on reason and authority.”
The probate court then in the case at bar, assuming it to be a court having a clerk and exercising jurisdiction according its record every fact essential to the right of the applicant to its record every fact essential to the right of the applicant to citizenship. Its jurisdiction being invoked, every presumption exists to now support it. The present attack is collateral. The defect urged as showing want of jurisdiction is a defect relating to evidence. If the record does not show the right of Frey, the presumption in favor of jurisdiction supplies the fact to support the judgment when collaterally • attacked. There is enough upon the record to show that the probate court of this county had the status of Frey before it to be adjudged. Having acted upon this subject-matter, the judgment of the probate court must be presumed to be corerct notwithstanding the omission upon the record. So long as the record demonstrates that the court was called, by an application properly made before it, to adjudicate upon a subject-matter over which the statute gave it power, the decree entered or t)ie order made must stand everywhere valid as against the world until reversed or set aside by a direct attack. It is presumed that adequate and sufficient proof was made. Whether such proof was before the court or was not before the court, constituted the very quesstion which the probate court then determined.
The application of the Japanese, cited in the ease 59 L. R. A., 671, showed by its terms that the petitioner was of a race not within' the power of the court to naturalize. The situation was the same as if that court had ordered the naturalization of an animal or of a dead person upon the application of his executor.
The case of Gagnon v. U. S., 193 U. S., 451, touching the power to enter an .order nunc pro tunc, which is cited in counsel’s brief, is quite in accord with the authority of our own state (Cleveland Leader v. Green, 52 O. S., 487), and its holding is not inconsistent with the jurisdiction of the probate court in the Frey case.
*102 The record before this court showing proceedings and judgment in the probate court in the matter of Frey does not show want of jurisdiction therein, because the records fails affirmatively to show that Frey resided within the United States continuously after his arrival until his application for admission to citizenship was filed in the probate court.
. We next inquire whether the probate court was one having common law jurisdiction.
Speaking generally of the existence and force of the common law in the state of Ohio, Judge Banney in Kerwacker v. R. R., 3 O. S., 178, says:
“At an early period in this state, the common law of England and the statutes of that country of a general nature, in aid of the common law, passed prior to the fourth year of King James I, were adopted by legislative enactment. But the act was repealed by the General Assembly of this state on the second of January, 1806, since which time the common law of England has had no force in this state by legislative adoption. But, having been adopted in the original states of the Union and introduced into Ohio at an early period, the common law has continued to be recognized as a rule of action in our courts in the absence of legislative enactments so far as its rules and principles appear to be based on sound reasoning and application to our condition and circumstances. The common law has, therefore, no force in Ohio except so far as it derives authority from judicial recognition in the-practice and course of adjudication in our courts; and this extends no further than it illustrates and explains the rules of right and justice as applicable to the circumstances and institutions of the people of the state.”
Such being generally the law of Ohio, what significance has attached to the term “having common law jurisdiction” when before the courts in connection with the Federal statute?
Two citations may suffice to define this phrase. In 1905 the Supreme Court of Minnesota, in the case of State, ex rel, v. Weber, 96 Minn., 422, p. 428, say:
“A court having common law jurisdiction is one whose powers are exercised ‘according to the course of the common law,’ and the phrase ‘according to the course of the common law,’ as interpreted by text-writers and judges, means a judicial determination of a controversy after due notice to the interested *103 parties and an opportunity to be heard. It is not necessary that the court, to possess common law jurisdiction in the meaning of the act of Congress, should be unlimited in power and authority. ’ ’
The United States Circuit Court of Appeals, in the case of Levin v. U. S., 63 C. C. of App., 476, p. 482 (s. c. 128 Fed. Rep., 826), Sanborn, Thayer and Hook sitting as judges, in 1904, said:
“Courts having a common law jurisdiction, within the meaning of this section, are those which have the power to punish offenses, to enforce rights, or to redress wrongs recognized by the common law, or of which in the determination of the cause which they decide are governed by the principles, rules and usages of that law. The term ‘having common law jurisdiction’ is used to distinguish those courts from those which have no jurisdiction save in equity, in admiralty, or in matters not’ involving offenses or rights under the common law. Courts which have some common law jurisdiction are courts having common law jurisdiction, and it is not indispensible to the qualification of a court under this act that it should have all the common laiv jurisdiction or even that it should have general common law jurisdiction.”
The court then remarks that the St. Louis Court of Appeals —whose jurisdiction was ■ there in question — is an appellate court with original jurisdiction to issue writs of habeas corpus, qtio warranto, mandamus, and other remedial writs and to hear and determine the same; that these are common law writs and in the issuing, the hearing and decisions upon them, that court must exercise common law jui’isdiction. The court comments that in the hearing and decision of actions at law presented to the St. Louis Court of Appeals for review its rule of- action and decision must in the great majority of cases, be rules, principles and usages of the common law. The conclusion was thus reached that the St. Louis Court of Appeals was a court having common law jurisdiction, and one which might admit qualified aliens to citizenship under the act of Congress. In this case the authorities are cited and reviewed.
By statute in this state, the probate court (Rev. Stats., 537), G-. C., 10499, “in exercise of the jurisdiction conferred shall have the same powers, perform the same duties and be governed by the *104 same rules and regulations as are provided by law for the courts of common pleas and the judges thereof in vacation so far as the same are consistent with the laws in force.”
It was said in argument that the jurisdiction of the probate court was and is ecclesiastical in its origin, and hence has not common law jurisdiction. In support of this view the decision of Judge Swan, in 1858,'speaking for the Hamilton county district court, was cited. In re Downs, 3 Dec. Reprint, 318, s. c. 2 Gaz., 18. That opinion does not present a wholly adequate conception of the jurisdiction of the probate court.
“The extent of jurisdiction exercised by the ecclesiatical courts of England included but a small proportion of the judicial authority involved in the adjudication of questions arising in the settlement of dead men’s estates, * * * the trial of disputed accounts involving the testimony of witnesses, questions of devastavit, liability to creditors, legatees, distributees, the marshaling of assets, recourse to real estate for the payment of debts and legacies; in short, the control over executors and administrators and payment of legacies, was exclusively in the common láw and chancery courts, as well as the appointment and removal of guardians and curators to minors and persons of unsound mind and control over them in respect to the management of their estates. It should, therefore, be remembered that there is a very' great difference between the totality of power exercised by the English ■ courts in connection with the estates of deceased persons — sometimes called testamentary or probate jurisdiction — and the testamentary or probate jurisdiction of ecclesiastical courts; a distinction which is of the utmost importance in ascertaining the eonclusiveness of judgments and decrees of the several classes of courts in collateral proceedings and 'in comparing the relative powers of ecclesiastical courts with those of American probate' courts. ’ ’ Woerner’s Law of Administration, Vol. 1, p. 319, Sec. 140.
Our probate court is endowed with the authority anciently exercised by the common law courts in relation to estates, both of decedents and insolvents.
In the ease of Doan v. Bitely, 49 O. S., 588, the jurisdiction of the probate court was found to extend to the determination of all questions relating to liens and distribution of proceeds in land sales. The Supreme Court expressly held the common law *105 to be in force in this state in relation to the sale by executors or administrators of notes and mortgages received by them from the sale of lands, and was applied in the ease of Jelke v. Goldsmith, 52 O. S., 500, see p. 513, which was matter of administration.
In all proceedings relating to crimes, and in the trial of causes heard before it, the probate court is governed by the rules descended from the common law. The common law rules relating to evidence are there applied. It has jurisdiction by statute to issue and hear causes arising on writs of habeas corpus, and, in a word, the court exercises jurisdiction “according to the course of the common law.” It is a jurisdiction wherein that law may be properly invoked and adopted by the court as applicable to cases • which are under consideration and when occasion arises. It is a court having common .law jurisdiction.
The defendant contends that the probate court could not exercise jurisdiction to naturalize aliens because the statute of the United States required that the state court exercising such power should be a court of record with common law jurisdiction, and having a seal and clerk. It has a seal. But it is denied that the probate court has a clerk within the meaning of the statute.
Section 533, Revised Statutes of Ohio, provided, at the time of Frey’s application for citizenship, that each probate judge should have the care and custody of all files, papers, books and records belonging to the probate office, and was authorized and empowered to perform the duties of clerk of his own court and to appoint deputy clerk or clerks who should qualify and perform any of the duties pertaining to the office of the clerk of the court.
But it is said that the statute requires that the clerk of the court should be a separate and distinct individual from the person occupying the office of judge. This contention does not seem to be supported by the statute nor the authorities. I am of the opinion that the requirement of the federal statute was not designed to extend thus far. The intent of that act was to impose, upon the exercise of the power conferred, such conditions as should assure a permanent record, properly kept by an offi *106 cer authorized thus to keep the record as a part of his official duty. The provisions of the Ohio statute fulfill this condition. The judge is ex officio also clerk of the court. He performs duties as clerk which are ministerial and which do not pertain to his judicial functions. In speaking of these clerical duties of the probate judge our Supreme Court, in its opinion by Judge Welch, says:
“If they were ministerial in the hands of the clerk they remained ministerial in fhe hands of the probate judge. In the absence of a deputy clerk, the probate judge is his own clerk, and responsible for acts done or omitted as such clerk on the same principles applicable to other ministerial officers. The provision of law authorizing him to appoint a deputy plainly implies that he is his own clerk, that he is both court and clerk, for there can be no deputy where there is no principal.” Warwick v. State, 25 O. S., 21, p. 24.
A deputy is one appointed as a substitute to act for another. The judge of probate certainly can not appoint a substitute for himself as judge. He occupies a dual position .and undertakes dual functions. The performance of the clerical function is insured by placing upon him as an authorized official the clerical duty of doing that work and under the statute he is legally responsible for the performance of these duties. While, as judge, he may not be called upon civilly to answer for an erroneous performance of his duty, yet in his function as clerk he may be sued and recovery had from him. Fairchild v. Keith, 29 O. S., 156.
I entertain no doubt that the probate court is a tribunal in this state having a clerk within the meaning of the statute of the United States.
Counsel'rely upon the case of Dean, Petitioner, 3 Maine, 489 (1891). In that case it is said:
“In the Municipal Court of Biddeford the responsible duty of making and keeping the records of the court is imposed upon the judge and not upon the recorder. There is no duty of making and keeping the records imposed upon the recorder by law. * * * Only such copies of the record as are duly certified by the judge shall be legal evidence in all courts. The authority to appoint a recorder was conferred upon the judge not for the *107 purpose of creating a fixed and permanent clerical office, distinct and separate from that of judge, but primarily to provide for the judge a substitute who would be empowered to act in his stead in the county named in the act. ’ ’
This language clearly differentiates the clerk of the court there under consideration from the probate judge with the powers and office of clerk of the probate court as provided by the Ohio statute.
In the case of Michael v. Gregg, 2 Curtis’ U. S. Cir. Ct. Rep., 98, it is said:
“In the act organizing the police court of Lynn the justice is directed to keep a fair record of the proceedings therein. # * * We are of the opinion that the police court of Lynn in which the justice was recording officer was not a court having a clerk within the meaning of the act of Congress. * * * A court of record necessarily requires some duly authorized person to record the proceedings. When the act speaks of courts-of record it speaks of courts whose proceedings are duly recorded by authorized persons, and then it says ‘ having a clerk or prothonary’ it super adds the requirement that these proceedings shall be recorded by one of these officers. The words ‘court of record’ carry with them the necessity of having the proceedings recorded by some one by authority of law. ’ ’
This case was subsequent and alludes to the suggestion of Shaw, C. J. in In re Gladhill, 8 Metcalf, 168, p. 171, who observes, speaking of the police court of Lynn:
“It might be argued that the act of Congress intended to limit the power of a court having a separate recording officer whose act should authenticate its doings, and that the signature of a separate officer might add something to the credit due to an authenticated transcript. On the other hand, it might be urged, with some plausibility, .that if the judge is specially vested by law with the clerical authority the.court has a clerk within the letter and equity of the statute.”
In 1878, in the case of State of Nebraska, ex rel, v. Webster, 7 Neb., 469, by the opinion of the court (474) it appears that no authority was given by the statute to the county judge to appoint a clerk, nor was a clerk provided by law for the county court over which he presided. The only provision was the *108 provision for an assistant or clerk. That court held this did not constitute a clerk within the meaning of the statute.
In all the cases the object sought to be attained by the act is considered to be an official record authoritatively kept by an authorized clerk. The same individual may fill the different offices. The right to exercise the function determines the existence of the officer. State, ex rel, v. Brennan, 49 O. S., 33, p. 38.
The defendant by his plea urges that the grand jury, being composed of bystanders a majority of whom had not been found and listed as competent persons by the jury commissioners, was not a body legally qualified to find and return an indictment. In support of this claim evidence was offered at the trial showing that the names of the grand jurors who returned the indictment were, with one exception, the names of persons not upon the jury lists made up for this county for jurors to serve during the years 1907 and 1908.
The act providing for jury commissioners and a list of jurors furnishes the means by which the names of members of the grand and petit jurors are usually obtained. Bates’ Rev. Stats. of Ohio, Section 5163 (96 O. L., p. 3).
The act providing for jury commissioners specially provides that nothing contained in the act shall affect the issuance by order of the court of special venires, as now provided by law.
' The suggestion is thrown out in argument that Section 7203 of the Revised Statutes providing for the calling of a special grand jury, after the discharge of the regular grand jury, has been by implication repealed; for the reason that Section 5164 contains the only statement of the qualifications of grand jurors, and the source from which the names of members of that body may be obtained.
The claims made above are substantially disposed of by a decision of the circuit court in the case of Stahl v. State (Wood county, 1905) 11 C. C. Rep., 23, p. 29, et seq. The sound reasoning of the court in that case applies aptly and precisely to the case at bar. AVith the reasoning in that ease and with, the conclusion reached — especially upon the point sought to be maintained'here — I am entirely in accord. The legislation under consideration providing for the selection of jurors may be said *109 to fix the standard for jurors whose names are placed in the wheel. The jury commissioners must certainly be satisfied that the persons selected by them are judicious and discreet persons having the qualifications of electors. But the statute still apparently rests the same confidence and authority in the court and sheriff of the county in the selection of jurors as before the creation of the jury commissions. These officials as well as the jury commissioners may properly call persons whom they consider fit, even if the person thus found fit be not among those theretofore selected for the jury list or among those whose names are contained within the jury wheel. Before the enactment of the law creating the jury commission and wheel for each county, no requirement existed that the qualification of grand jurors should be limited to listed persons. The list and wheel are incidental to the new scheme, and the scheme being one supplemental and additional to the use of venires as provided by law, the provision for lists can be viewed only as one of the matters relating to the names which shall come into the wheel. It is not a qualification to be generally extended as applicable to all jurors whomsoever, who may be called.
A single contention remains, which it is not necessary to consider at length. Counsel claim that the presence of assistant stenographers not being the stenographer appointed as the official stenographer of the county, in the jury room during its deliberations upon this indictment, invalidates the indictment returned by the grand jury. 'It does not appear by the evidence that these persons, participated in the discussion, offered any comment, or that neither were present when any vote was talien. Prejudice, therefore, does not appear to any right of the defendant, Metzger, and the weight of authority is to the effect that to invalidate an indictment by reason of the presence of an unauthorized person in the grand jury room, prejudice must affirmatively appear. Am. & Eng. Encyc., 2d Ed., Title “Jury and Jury Trials,” Vol. 17, p. 1293.
In view of the fact that no Ohio authority, controlling in this jurisdiction, declares the presence of unauthorized persons in the jury room to be such irregularity as requires the court to set aside an indictment, I am unwilling to sustain the plea of abate *110 ment upon this ground, nor am. I able to see how a presentment should be set aside on such a showing. In this I am supported by Ohio v. Murmaw, 12 O. Dec., 785.
For these reasons the plea of abatement is not sustained and finding and judgment thereon are against the defendants.